OPINION
Appellant National Union Fire Insurance Company of Pittsburgh, Pennsylvania ("National Union") appeals the decision of the Stark County Court of Common Pleas that awarded prejudgment interest, from June 12, 1998 to October 2, 2001, in the amount of $3,273,780.96 to Appellee Mitchell Floom. The following facts give rise to this appeal.
On January 17, 1998, Floom was a passenger in a motor vehicle driven by Ann Spehar on Interstate 77. Spehar drove over black ice, spun-out on the highway and came to rest in the right shoulder with a flat right front tire. Floom left the vehicle to change the flat tire. Shortly thereafter, Tracy McGuire lost control of her vehicle, on the same patch of ice, and spun-out pinning Floom between her vehicle and Spehar's vehicle. As a result of the injuries Floom sustained in the accident, he underwent bilateral above the knee amputation.
At the time of the accident, McGuire was insured by Reliant Insurance Company ("Reliant") with a policy limit of $12,500. By letter dated June 12, 1998, Reliant offered Floom its policy limits in exchange for a release of McGuire. Reliant again renewed its offer of settlement on September 8, 1998 and February 10, 1998. On October 17, 2000, Floom sent a letter to Claims Management, Inc., the claims administrator for Wal-Mart where Floom was employed on the date of the accident. The purpose of the letter was to place Wal-Mart's underinsured motorist carrier on notice of Floom's underinsured motorist claim.
In turn, Claims Management, Inc. submitted Floom's letter to National Union. National Union's receipt of this letter was the first notice it had of Floom's claim for underinsured motorist coverage. By letter dated January 9, 2001, National Union acknowledged Floom's claim and requested additional details of Floom's underinsured motorist claim.
Thereafter, on February 12, 2001, Floom filed a complaint against National Union seeking underinsured motorist coverage. National Union failed to file an answer or other responsive pleading. On March 20, 2001, Floom sought a default judgment which the trial court granted the following day. The trial court scheduled a damages hearing for April 20, 2001. On April 17, 2001, National Union filed a Motion to Vacate Default Judgment. On April 18, 2001, the trial court conducted a telephone conference with the parties. During this conference, National Union agreed to waive policy defenses that may have been available to it and submit Floom's claim to binding arbitration in consideration of the damages hearing being canceled.
This matter proceeded to arbitration on August 16, 2001. Prior to arbitration, National Union requested copies of all documents evidencing settlements with McGuire in order to determine setoff. In response to this discovery request, Floom sought and obtained a protective order and has never produced any evidence concerning if or when Reliant paid its policy limits to Floom. On September 4, 2001, the arbitrators entered an award in favor of Floom in the amount of $10,000,000. On October 2, 2001, the trial court entered judgment in the amount of $9,900,000 reducing the award by sums previously received by Floom.
On this same date, Floom filed his Motion for Prejudgment Interest. In his motion, Floom argued that underinsured motorist benefits became due and payable on June 12, 1998, the date Reliant sent Floom its first of three letters offering the policy limits in exchange for a release from McGuire. National Union responded that since the policy provided that money was due and payable "only after all * * * policies have been exhausted by * * * payments," Floom's right to prejudgment interest did not attach until the later of the date Floom received payment from the tortfeasor or the date National Union received notice of Floom's claim for underinsured motorist benefits.
On November 9, 2001, the trial court found in favor of Floom and awarded him prejudgment interest in the amount of $3,273,780.96. The trial court found prejudgment interest triggered from June 12, 1998 to October 2, 2001, the date on which the arbitrators issued their decision. National Union timely filed a notice of appeal and sets forth the following assignments of error for our consideration:
 "I. THE TRIAL COURT ERRED AS A MATTER OF LAW IN AWARDING PREJUDGMENT INTEREST FROM JUNE 12, 1998 WHEN THE POLICY PROVIDED THAT COVERAGE ATTACHED ONLY AFTER EXHAUSTION BY PAYMENT OF THE UNDERLYING POLICIES, AND PAYMENT WAS NOT MADE ON JUNE 12, 1998.
 "II. THE TRIAL COURT ABUSED ITS DISCRETION IN AWARDING PREJUDGMENT INTEREST FROM JUNE 12, 1998 WHEN FLOOM DID NOT GIVE NOTICE OF HIS CLAIM UNTIL OCTOBER 17, 2000."
 I
In its first assignment of error, National Union maintains the trial court erred when it awarded prejudgment interest from June 12, 1998 when the policy provided that coverage attached only after exhaustion by payment of the underlying policies and payment was not made on June 12, 1998. We agree.
Throughout the State of Ohio, there are differing points of view on the issue of when prejudgment interest begins to run on an uninsured/underinsured claim. The Ohio Supreme Court, in the case ofLandis v. Grange Mut. Ins. Co., 82 Ohio St.3d 339, 1998-Ohio-387, explained the basis upon which prejudgment interest in uninsured/underinsured cases is to be determined. However, in doing so, the Court did not set forth specific guidelines concerning what is necessary to determine an appropriate date to trigger the running of prejudgment interest.
Although lacking in these specific guidelines, the Landis case does contain the following pertinent points of law. First, a claim for uninsured/underinsured benefits is a contract claim, not a tort claim. Thus, an insured can recover prejudgment interest, under R.C. 1343.03(A), the statute governing interest on contracts, book accounts and judgments. Id. at 341.
Second, lack of good faith effort to settle a case is not a predicate to an award of prejudgment interest under R.C. 1343.03(A). Finally, Justice Pfeifer states, with reference to the date from which prejudgment interest should run that:
 "Whether the prejudgment interest in this case should be calculated from the date coverage was demanded or denied, from the date of the accident, from the date at which arbitration of damages would have ended if Grange had not denied benefits, or some other time based on when Grange should have paid Landis is for the trial court to determine." Id. at 342.
Based upon the above language, it is clear that it is within the trial court's discretion to determine the trigger date for prejudgment interest. See Nichols v. Milwaukee Ins. Co. (Aug. 21, 2000), Stark App. No. 2000CA00066. Under the abuse of discretion standard, the trial court's discretion is not absolute, but it is very broad. Because the trial court's discretion is not absolute, appellate courts, as well as the Ohio Supreme Court, must review the trial court's finding to determine whether the trial court's decision was unreasonable, arbitrary or unconscionable and not merely an error of law or judgment. Blakemorev. Blakemore (1983), 5 Ohio St.3d 217, 219.
In its judgment entry granting prejudgment interest, the trial court concluded June 12, 1998 was the trigger date for prejudgment interest because that was the date Reliant sent Floom its first letter offering the policy limits in exchange for a release from McGuire. The trial court also concluded there was no ambiguity in the policy language and that the case law fully supported this determination. Judgment Entry, Nov. 5, 2001, at 1.
The policy language at issue, provides, in pertinent part:
"A. COVERAGE
"* * *
 "2. If this insurance provides a limit in excess of the amounts required by the applicable law where a covered `auto' is principally garaged, we will pay only after all liability bonds or policies have been exhausted by judgments or payments."
National Union contends on appeal that both Floom and the trial court incorrectly interpreted the phrase "exhaustion by * * * payments" to mean an unaccepted offer of payment. By doing so, National Union argues Floom and the trial court failed to give the term "payment" its plain and ordinary meaning, which is the affirmative act of transferring money from one party to another.
In response, Floom contends National Union, by drafting the language at issue, decided to link its duty to pay to the moment when the liability policy is exhausted. Floom contends this moment occurred when Reliant indicated in a letter dated June 12, 1998, that it was offering the policy limits of $12,500 in exchange for a release of McGuire because this exhausted the tortfeasor's policy limits which were significantly less than National Union's $10,000,000.
Floom cites several cases in support of this argument. The first case cited by Floom is Bogan v. Progressive Cas. Ins. Co. (1988),36 Ohio St.3d 22, which held:
 "An injured insured satisfies the `exhaustion' requirement in the underinsured motorist provision of his insurance policy when he receives from the underinsured tortfeasor's insurance carrier a commitment to pay an amount in settlement with the injured party retaining the right to proceed against his underinsured motorist insurance carrier only for those amounts in excess of the tortfeasor's limits." Id. at paragraph two of the syllabus.
We find the Bogan decision factually distinguishable from the case sub judice. In Bogan, counsel for the Bogans informed Progressive Casualty Insurance Company ("Progressive") that Nationwide Mutual Insurance Company ("Nationwide") had offered to compromise the claim for $21,000 in exchange for a full and complete release of the tortfeasor from any liability. Id. at 23. The letter also clearly provided that "Mr. Bogan intends to settle * * * for the sum of $21,000." Id. Progressive refused to give its consent to settle because the settlement did not exhaust the tortfeasor's policy limits of $25,000. Id. at 27. The language at issue provided as follows:
 "The company shall not be obligated to make any payment * * * until after the limits of liability under [all other insurance policies] * * * have been exhausted by payment of judgments or settlements." (Emphasis sic.) Id.
In concluding that the Bogans had exhausted the tortfeasors' policy limits, the Ohio Supreme Court refused to adopt a strict application of the term "exhaust." Id. at 28. Instead, the Court explained that:
 "* * * the objective of the exhaustion clause in the underinsured motorist insurance policy is quite clearly to absolve the insurer from liability for those uncollected amounts which were below the stated limits of the underinsured tortfeasor's policy. This goal was fully satisfied by the Bogans' written assertion that they would seek underinsured motorist coverage from Progressive only for those damages in excess of Nationwide's policy limits. Therefore, an injured insured satisfies the `exhaustion' requirement in the underinsured motorist provision of his liability insurance policy when he receives from the underinsured tortfeasor's insurance carrier a commitment to pay an amount in settlement, the injured party retaining the right to proceed against his underinsured motorist insurance carrier only for those amounts in excess of the tortfeasor's policy limits. * * * From the standpoint of Progressive, Nationwide's policy limits were exhausted when the Bogans voluntarily decided to treat the proffered settlement as a receipt of the entire policy limits for all applicable purposes." Id. at 28.
In the matter currently before the court, the record indicates Reliant offered its policy limits of $12,500, to Floom, on three separate occasions to settle this matter. Reliant made its first offer, by letter, on June 12, 1998. Reliant followed up on its offer on September 8, 1998, with a phone call and letter again offering the policy limits. Reliant made its final offer to settle for the policy limits, by letter, on February 10, 1999. There is no evidence in the record that indicates Floom intended to accept or accepted any money from Reliant as settlement of his claim against McGuire.
We believe, based upon the language of Bogan, that a mere offer to settle is insufficient to satisfy the exhaustion requirement. Instead, there must also be an affirmative act on the part of the injured party that establishes his or her intent to accept money from the tortfeasor's insurer to settle the claim against the tortfeasor. In Bogan, the affirmative act was a letter Bogan sent to Progressive in which he indicated his intent to accept $21,000 to settle the claim against the tortfeasor. However, in the matter currently before the court, unlike inBogan, Floom has never indicated his intention to accept Reliant's proffered $12,500 policy limits.
The Ohio Supreme Court recently again addressed the exhaustion requirement issue in Fulmer v. Insura Property Cas. Co.,94 Ohio St.3d 85, 2002-Ohio-64. In Fulmer, the tortfeasor's insurer offered $37,500 to settle Fulmer's claim against the tortfeasor. Id. at 87. The tortfeasor's policy had liability coverage limits of $50,000. Id. at 86. Although Fulmer believed that her damages exceeded the tortfeasor's policy limit of $50,000, she decided to accept the offer and forgo the additional $12,500 available under the tortfeasor's insurance policy. Id. 87. Fulmer's acceptance of the settlement offer required her to execute a release of all claims against the tortfeasor. Id.
After settling with the tortfeasor, Fulmer requested arbitration with her insurance company, Insura Property Casualty Insurance Company ("Insura") to determine whether she was entitled to underinsured motorist benefits. Id. at 88. Insura rejected Fulmer's request for arbitration on the basis that Fulmer had violated the exhaustion and subrogation clauses of her policy and therefore, forfeited her rights to underinsured motorist benefits. Id.
On appeal to the Ohio Supreme Court, the Court concluded that Fulmer had not violated the exhaustion or subrogation clauses and held:
 "An insured satisfies the exhaustion requirement in the underinsured motorist provision of her insurance policy when she receives from the underinsured tortfeasor's insurance carrier a commitment to pay any amount in settlement with the injured party retaining the right to proceed against her underinsured motorist insurance carrier only for those amounts in excess of the tortfeasor's available policy limits." (Emphasis sic.) Id. at paragraph two of the syllabus.
The Court further explained that "* * * if an insured accepts a paymentin any amount from the tortfeasor she has not abandoned her claim against the tortfeasor." (Emphasis sic) Id. at 95. Thus, "* * * from the underinsurer's standpoint, the tortfeasor's policy limits are exhausted when the insured voluntarily decides to treat the proffered settlement as a receipt of the entire policy limit." Id. at 94-95.
The Fulmer case is also distinguishable from the case sub judice in that Fulmer gave Insura notice of the settlement offer and thereafter settled with the tortfeasor's insurer and signed a settlement agreement thereby complying with the exhaustion requirement of Insura's policy. However, in the matter currently before the court, there is no evidence, in the record, that Floom intended to accept payment, in any amount, from Reliant, even though Reliant offered its policy limits on three separate occasions. Instead, because the record does not establish that Floom accepted or intended to accept Reliant's offer to settle, it appears as if Floom has abandoned his claim against the tortfeasor.
Thus, we conclude that neither Bogan nor Fulmer apply to the facts of this case as these cases address the exhaustion concept as it applies to an injured party's entitlement to uninsured/underinsured motorist proceeds. Specifically, whether acceptance of less than the tortfeasor's policy limits meets the definition of "exhaust" as defined in the policy of insurance for purposes of triggering uninsured/underinsured motorist coverage. However, in the matter currently before the court, we are asked to consider the exhaustion concept as it relates to the triggering of prejudgment interest.
Finally, Floom relies on the case of Cotner v. UnitedStates Fidelity Guaranty Co. (1998), 126 Ohio App.3d 664, which contains almost identical language to that under consideration in the case sub judice. In Cotner, the court held:
 "* * * an action for underinsured motorist coverage accrues when the injured party settles with the tortfeasor or when the injured party notifies the carrier of underinsured motorist coverage that the liability insurance carrier has made an offer of settlement and the injured party intends to pursue underinsured motorist coverage." Id. at 670.
Floom maintains that under the Cotner decision, the trial court correctly concluded that he was entitled to prejudgment interest from June 12, 1998, the first date on which Reliant offered to settle the case against the tortfeasor for the policy limits. We decline to accept the analysis of the trigger date for prejudgment interest adopted by the Sixth District Court of Appeals in the Cotner case.
Instead, we find our recent decision in Ickes v. CNA Insurance, Stark App. No. 2001CA00241, 2002-Ohio-2531 dispositive of this matter on appeal. In the Ickes case, Shirley Ickes received serious injuries in an automobile accident. Id. at 1. Shirley Ickes and her husband Ronald Ickes presented claims to the tortfeasor's insurer. Id. The tortfeasor carried minimum liability limits of $12,500 per person with Progressive Insurance Company ("Progressive"). Id. On December 31, 1999, the Ickeses and Progressive entered into a settlement agreement for the policy limits. Id. The Ickeses thereafter filed an underinsured motorist claim against their own insurer, Allstate Insurance ("Allstate"). Id. The Ickeses and Allstate entered into a settlement agreement on January 3, 2000, for the maximum benefit available, $12,500. Id.
Subsequently, the Ickeses filed Scott-Pontzer claims against their respective employers seeking underinsured motorist coverage. Id. Shirley Ickes' employer was insured by Kemper National Insurance Companies ("Kemper"). Id. Ronald Ickes' employer was insured by CNA Insurance Group ("CNA"). Id. On February 2, 2001, the Ickeses claims were submitted to binding arbitration pursuant to the Kemper and CNA policy language. Id. The arbitration panel unanimously agreed that the total damages for the Ickeses were $1,450,000. Id. The arbitration panel issued an arbitration award on February 13, 2001. Id. On February 21, 2001, the Ickeses filed their Application to Confirm the Arbitration Award and Reduce to Judgment. Id. In addition, the Ickeses filed a Motion for Prejudgment Interest. Id.
The trial court issued a judgment entry on July 6, 2001. Id. However, the judgment entry contained errors and the trial court issued a nunc pro tunc entry on July 10, 2001. Id. In this entry, the trial court granted the Ickeses' application and motion thereby confirming the arbitration award and awarding prejudgment interest commencing January 3, 2000. Id. The Ickeses filed a Motion for Reconsideration arguing the start date for prejudgment interest should have been the date they settled with the tortfeasor's liability carrier, May 15, 1997. Id.
On August 17, 2001, the trial court entered a second nunc pro tunc entry in which it indicated "it was the intention of the court to use the date of settlement of the tortfeasor's claims (December 29, 2000) as the date for the commencement of pre-judgment interest." Id. On appeal to this court, we first determined our review was limited to the July 10, 2001 judgment entry which sought to correct a clerical error in the July 6, 2001 judgment entry regarding a date. Id. at 2. The July 10, 2001 judgment entry changed the commencement date for prejudgment interest from January 3, 2001 to January 3, 2000, the date the Ickeses settled with their own insurer, Allstate. Id. We concluded the August nunc pro tunc judgment entry sought to correct more than a clerical error and therefore, was void. Id.
The next issue we considered was whether the trial court abused its discretion in deciding to begin the accrual date of prejudgment interest on the date the contingencies had been met for the payment of underinsured motorist benefits under the Kemper and CNA policies. Id. at 3. In considering this issue, we concluded the trial court correctly relied on the language contained in the Kemper and CNA policies of insurance to determine the accrual date of prejudgment interest. Id. at 4. However, we found the trial court incorrectly interpreted the meaning of the language contained in the policies. Id.
The following language was contained in both policies:
"A. Coverage
 "1. We will pay all sums the `insured' is legally entitled to recover as compensatory damages from the owner or driver of an `uninsured motor vehicle' because of `bodily injury' sustained by the `insured' caused by an `accident'.
"* * *
 "2. We will pay under this coverage only if a. or b. below applies:
 "a. The limits of any applicable liability bonds or policies have been exhausted by judgments or payments;
"* * *"
Based upon the above language, which is identical to the language contained in National Union's policy, this court determined "* * * the correct interpretation is that the uninsured benefits were due and payable under the Kemper and CNA policies when the tortfeasor's policy was exhausted by payment." Id. at 5. Thus, the uninsured benefits were due and payable from the Kemper and CNA insurance policies as of December 31, 1999, when the Ickeses signed a release in favor of the tortfeasor and the tortfeasor's liability insurer in exchange for $12,500, the limits of the tortfeasor's policy. Id.
The Ickeses argued the trial court should have awarded prejudgment interest from May 15, 1997, the date the tortfeasor's insurance company offered its limits of $12,500 in exchange for a release. Id. We specifically rejected this argument finding instead that the date the settlement was actually completed with payment and signing of the release was the date on which the tortfeasor's policy was exhausted pursuant to the language of the Kemper and CNA policies. Id.
Thus, based upon our decision in Ickes, we remand this matter to the trial court for the court to determine the date on which Floom settled with Reliant as it is on this date that McGuire's policy was exhausted by payment. This conclusion is consistent with the applicable prejudgment interest statute, R.C. 1343.03(A), as settlement between the parties is one of the five situations, under the statute, that triggers the commencement of prejudgment interest.
National Union's first assignment of error is sustained. We will not address the merits of National Union's second assignment of error as it is moot based upon our disposition of its first assignment of error.
For the foregoing reasons, the judgment of the Court of Common Pleas, Stark County, Ohio, is hereby reversed and remanded for proceedings consistent with this opinion.
WISE, J., FARMER, P.J., and EDWARDS, J., concur.